UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BASIL PERRY, #261718,

                Petitioner,

                                      CASE NO. 2:12-CV-10885
v.                                  HONORABLE DENISE PAGE HOOD

JEFF WOODS,

                Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**

**I.    Introduction**

      Michigan prisoner Basil Perry ("Petitioner") has filed a *pro se* petition for a writ of

habeas corpus pursuant to 28 U.S.C. §2254 asserting that he is being held in violation of

his constitutional rights.  Petitioner was convicted of four counts of third-degree criminal

sexual conduct, MICH. COMP. LAWS § 750.520d(1)(a), and one count of child sexually

abusive activity, MICH. COMP. LAWS § 750.145c(2), following a jury trial in the Monroe

County Circuit Court.  He was sentenced as a third habitual offender, MICH. COMP. LAWS

§ 769.11, to concurrent terms of 10 to 30 years imprisonment on the criminal sexual

conduct convictions and 10 to 40 years imprisonment on the child sexually abusive activity

conviction in 2006.  In his pleadings, he raises claims concerning the trial court's denial of

his motion for relief from judgment and the effectiveness of trial and appellate counsel.

Respondent has filed an answer to the petition contending that it should be denied.  For the

reasons stated herein, the Court concludes that Petitioner's claims lack merit and denies

the petition.  The Court also denies a certificate of appealability.

## II.   Facts and Procedural History

Petitioner's convictions arise from his sexual activities and picture-taking with two teenage girls in Luna Pier, Michigan in 2004.  At trial in 2006, former Luna Pier police officer Dean Ansel testified that he responded to a call from Petitioner's son, Blake Perry ("Blake"), at their residence in October, 2004.  When he arrived, Blake gave him sexually explicit photographs depicting Petitioner and two teenage girls and asked to be taken to the police station.  Ansel took Blake to the police station and the photographs were tagged and put in the evidence locker.  The matter was eventually referred to the Michigan State Police.  Ansel did not further investigate the matter, although he did speak with Magdelena Sanchez who came looking for Blake that day and with Petitioner by phone that evening.

Tara Stout ("Tara"), age 19, testified that she first met Petitioner around March, 2004 when he was dating one of her friends and that she introduced him to her cousin, "MR." Tara identified several photographs depicting herself, MR, and Petitioner and said that they were taken in Petitioner's bedroom.  In those photographs, Tara and MR are nude and Petitioner is wearing shorts, but no shirt.  Petitioner took the photographs of the girls and either she or MR took the photographs with Petitioner.  A few photographs were taken in the Monroe Rite Aid parking lot when Petitioner first bought the camera.

Tara stopped seeing Petitioner around July, 2004 after he bought her a car, although she did not have a driver's license.  The last time she saw Petitioner was when he met her and MR on the road to change a tire.  Tara no longer had the car and believed that it was either stolen or retrieved by Petitioner when she was in Taylor, Michigan.  Tara said that she had copies of the photographs for a period of time, but she thought they were in the

2

car when it was taken.

Tara testified that she engaged in sex with Petitioner three times in 2004 when she was 17 years old.  She was also present when Petitioner had regular sex and oral sex with MR – at the time when the photographs were taken.  She did not believe that MR saw Petitioner again after they met him on the road.

On cross-examination, Tara testified that Petitioner asked her to care for his son after she met him.  She asked Petitioner to buy her the car, but never reported it stolen because it was not in her name and she did not have a license.  Tara said that she had sex with Petitioner after he had broken up with her friend.  She introduced MR to Petitioner because MR's parents had kicked her out, MR was a call girl and needed money, and Petitioner had money.  Tara never felt threatened by Petitioner.  Tara testified that she engaged in sexual activity with Petitioner and MR at his home when no one else was there.  She said that she had engaged in such activity with MR before but had never taken photographs or videotapes previously.  She denied that the photographs were taken at a motel in Ohio.  She said that Petitioner bought her the car because she and MR agreed to have a threesome with him.  Tara admitted that she used Petitioner to get a car and that MR used him for money and a place to stay.  MR took care of Petitioner's son while he was at work.  Tara admitted that they were drinking when the threesome occurred.  Afterward, one of Petitioner's friends came over with a case of beer.

Tara's mother and MR's aunt, Tammy Redding, testified that she met Petitioner when he came to her apartment looking for the girls in August, 2004.  She told him that they did not live there.  When Petitioner asked how old MR was, Redding told him that MR was 15 years old.  Petitioner said that was not what the girls had told him.

3

MR testified that she met Petitioner while visiting her cousin Tara at a friend's apartment in Monroe.  She also went to Petitioner's house with him and Tara.  When Petitioner asked her how old she was, she lied and told him she was 17 years old even though she was only 15 years old.  MR reviewed the photographs and identified the people in them as herself, Tara, and Petitioner.  She said that the photographs were taken at Petitioner's house in Luna Pier and at a drug store in Monroe.  The photographs were taken with Petitioner's camera and he had the film developed at the store.  The three of them took turns posing and taking the photographs in the summer of 2004.  MR also testified that she had vaginal, digital, and oral sex with Petitioner during that same time period when she was only 15 years old.

MR further testified that she stayed in the Monroe area, at Tara's friend's apartment and Petitioner's house, most of that summer.  She and Tara left the area in late August or early September, 2004.  MR said that she and Tara had a copy of the photographs after they were first developed, but Petitioner took them back some time before the car was taken.  MR said that she told Petitioner and other people that she was 17 years old because she wanted to be older.  She acknowledged that she never reported Petitioner's actions to the police.  At the time of trial, she lived with her father in River Rouge, Michigan.

On cross-examination, MR admitted that Tara introduced her to Petitioner because she (MR) was running the streets and did not have a place to stay.  She thought that she first met Petitioner in June, 2004 and that it was a few weeks before a dance recital that they attended together.  At one point, MR spoke to a social services employee about caring for Petitioner's son.  She told the woman that she was 17 years old, but she could not produce identification.  As to the photographs, MR said that they were drinking at the time,

4

but she knew what she was doing.  She confirmed that she did not report her activities with Petitioner to the police.  She also admitted that she had sex with other men to get money and that she told them that she was 17 or 18 years old.  She did not take photographs or videotapes with them.

MR confirmed that she had sex with Petitioner at his house, that Tara was present, and that the photographs were taken in July, 2004.  MR recalled being in juvenile detention, but could not recall if they took the photographs before or after that time.  She said that she and Tara saw Petitioner a few times after she got out of detention, but stopped once they got the car.  She remembered seeing Petitioner when they had a flat tire near the campground.  MR was not sure if Petitioner's son was living with Petitioner before she went to the detention center, but he was afterward.  MR denied knowing Magdelena Sanchez.  MR admitted that she lied to Petitioner and that she lies when dealing with other people.  On re-direct examination, MR admitted that she stayed with Petitioner and had sex with him because he gave her "money and stuff" and she used him.

MR's father, Robert Redding, confirmed that his daughter was born in September, 1988.  He said that he did not know what his daughter was doing in 2004.  He had never met Petitioner before seeing him in court.  On cross-examination, he testified that he received a call from Tammy Redding that MR was at her house and that she did not want her staying there.  He also recalled that MR was arrested for shoplifting in the spring of 2004 and that he saw the girls at a campground.

Michigan State Police Detective-Sergeant David Meyer testified about his investigation of the case.  He obtained the photographs of the girls and Petitioner from the Luna Pier Police Department in November, 2004.  He spoke to Tammy Redding in

5

December, 2004, MR just before the preliminary examination, and Tara Stout just after the exam. He interviewed Petitioner at the Monroe County Jail in November, 2004 and at the Michigan State Police Post in December, 2004. Petitioner admitted that he was in some of the photographs with the girls, that he took some of the photographs, and that he developed the photographs, all in Luna Pier.

On cross-examination, Meyer testified that Petitioner was being held in the jail on an immigration matter when he first spoke to him, that he came in voluntarily for the second interview, that he showed Meyer the car paper signed by Tammy Redding, and that he admitted being in the photographs. Meyer also recalled his conversations with Tara Stout in which she admitted being in some photographs, taking some photographs, and having sex with Petitioner at his house in Luna Pier. Meyer said that they did not search Petitioner's house because he relied on the girls' statements and Petitioner's admission about where the photographs were taken. The issue of sexual activity between Petitioner and MR was first brought out when MR testified at the preliminary examination. Meyer then contacted Tara Stout and she confirmed those allegations.

Petitioner did not testify at trial. His son, Blake Perry, testified that MR was his babysitter when he lived with his dad in Luna Pier in 2004. He thought that this was during football season. On cross-examination, Blake testified that he called the police after he got into a fight with MR. He initially denied giving the photographs to the police officer, but then admitted doing so. Blake acknowledged that he is bipolar and has memory problems.

After a short deliberation, the jury found Petitioner guilty of the charged offenses. The trial court subsequently sentenced him to the terms of imprisonment previously set forth.

6

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising sentencing claims. The court denied relief and affirmed his convictions and sentences. *People v. Perry,* No. 270283, 2007 WL 1712959 (Mich. Ct. App. June 14, 2007) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Perry,* 480 Mich. 1036, 743 N.W.2d 562 (2008).

Petitioner then filed a motion for relief from judgment with the state trial court raising claims concerning the effectiveness of trial and appellate counsel. The trial court ordered a *Ginther* hearing. *People v. Perry*, No. 05-34243-FH (Monroe Co. Cir. Ct. Nov. 24, 2008). At that evidentiary hearing, Petitioner's trial counsel, Asad Farah, testified that he began practicing law in 1995, and that he had litigated many criminal cases, including some criminal sexual conduct cases, before representing Petitioner. He was the third court-appointed attorney for Petitioner. He was appointed in 2005 after attorney John Landis withdrew. Farah spoke with Landis, reviewed the file, met with Petitioner at the jail, and communicated with him in several letters.

Farah recalled that Petitioner had mentioned witnesses who dealt with pictures or videos, but he did not provide locations and Farah did not know where to look for them. They also discussed Petitioner's girlfriend, Magdelena Sanchez ("Magdelena"), and her potential testimony that the girls were there to care for his son and she was present when they came over. Farah told Petitioner that he thought Magdelena's testimony would harm his case because she was young when they began their relationship, which could show predatory conduct in dealing with young females. Farah also had difficulty finding Magdelena. When he tracked her down at her mother's house to serve a subpoena, she

7

ran away from him.  He told Petitioner what happened, but Petitioner did not believe him. Farah denied that Petitioner told him that Magdelena was in the local jail.

Farah also recalled Petitioner telling him about a used car dealership on Telegraph Road, but it was out of business at the time of Farah's representation and he did not have anyone to contact.  He checked county records and called the property owner, but no one returned his call.  Farah knew that Landis had prevailed on an evidentiary motion to admit a videotape, but neither he nor Landis ever had the videotape.  Petitioner told Farah that it would be in his house, but by the time of trial, Petitioner had been evicted and his belongings were gone.  Farah obtained this information from the Luna Pier Police Chief. Petitioner told him that he owned the house and had not been evicted, but Farah checked the Register of Deeds and found no house in Petitioner's name.  He also checked on a car that Petitioner said he owned, but it was registered to Magdelena Sanchez.

Farah testified that Petitioner claimed that the photographs were taken in Ohio, but Farah could not recall whether he mentioned the Crown Motel.  Farah admitted that he might have referenced the Crown Motel while questioning one of the girls, but said that he would not have asked follow up questions if he did not know what her answers would be and he would not want to elicit damaging testimony.  Farah said that where the photographs were taken was not so important to him because Petitioner had the photographs at his home.  Farah recalled that there were contradictions in the witnesses' testimony.  Farah testified that he called Blake Perry as a defense witness at Petitioner's insistence, but he was against doing so because Blake's testimony could confirm that Petitioner possessed the photographs at his house.

8

On cross-examination, Farah testified that he went to Petitioner's house to look for the videotape, but there was nothing there and the landlord told him that the belongings were removed when he got the eviction.  Blake Perry did not know about a videotape. Farah did not know if the videotape actually existed and he was surprised that there was a motion filed about a videotape that did not exist. Farah recalled questioning the girls about their sexual activity with others and asking at least one of them about pictures or videos.  Farah did not think that the videotape would have helped the defense because the charging statute for sex with a minor is a strict liability statute.  Farah recalled discussing, via letters, additional witnesses with Petitioner, but he was not provided with information to locate them and he was unable to serve a subpoena on Magdelena Sanchez.  He tried to locate the state employees, but they had been fired and he could not obtain their home addresses.  Farah did not seek an adjournment, but he did not believe that other witnesses would have benefitted the defense due to the crime's strict liability and because he did not have enough information to locate the witnesses.  His trial strategy was to challenge the girls' testimony, argue constructive emancipation, and hope for jury nullification.  He did not believe that there was a good defense to the charges based upon Petitioner's possession of the photographs and his sexual activity with the girls, one of whom was underage.

Petitioner's prior counsel, John Landis, testified that he was appointed to represent Petitioner on a charge of child sexually abusive material, but the charges of criminal sexual conduct were added after the preliminary examination.  He recalled discussing a videotape of the girls having sex with other men with Petitioner at the admissibility hearing, but he never located the videotape.  He said that Petitioner identified a man named Dave Wilson, an Ohio resident, as a witness who would testify that the photographs were taken in Ohio.

9

He spoke with Detective Meyer and asked the prosecutor to track Wilson down as a res gestae witness, but no one was able to locate him. Landis also recalled his own unsuccessful attempt to locate a state employee identified by Petitioner as a possible witness. Landis said that his relationship with Petitioner deteriorated because Petitioner believed that certain information was important and Landis disagreed due to the strict liability of the crime. Landis' trial strategy would have been the same as Farah's strategy – to argue constructive emancipation and seek jury nullification – because there was no good defense to the charges.

Petitioner did not testify at the evidentiary hearing.

Following the hearing, the trial court denied the motion for relief from judgment finding that neither trial counsel nor appellate counsel were ineffective. *People v. Perry*, No. 05-34243-FH (Monroe Co. Cir. Ct. July 6, 2009). Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Perry*, No. 298966 (Mich. Ct. App. April 1, 2011) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Perry,* 490 Mich. 968, 806 N.W.2d 518 (2011).

Petitioner thereafter filed his federal habeas petition raising the following claims:

I.     The trial court abused its discretion when it denied his motion for relief from judgment.

A.     His 6th Amendment constitutional right to effective assistance of counsel was violated (where trial counsel failed to call witnesses or seek an adjournment to locate them).

10

    B.    He was denied his right to due process and his right to effective assistance of counsel by counsel's failure to produce video evidence to impeach the prosecution witness and demonstrate an additional basis for believing that the complainant was 18 years old.

    C.    Trial counsel's cumulative errors resulted in a due process violation.

II.    His 6th Amendment constitutional right to the effective assistance of appellate counsel was violated (where appellate counsel failed to raise the foregoing issues on direct appeal or provide him with a copy of the appellate brief).

Respondent has filed an answer to the petition contending that it should be denied because

the claims are barred by procedural default and/or lack of merit.

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28

U.S.C. § 2241 *et seq.*, provides the standard of review for federal habeas cases brought

by state prisoners.  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state

12

court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id.* In order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision.  *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785.  It "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.  While the requirements of "clearly established

13

law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## VI.   Analysis

### A.   Procedural Default

As an initial matter, Respondent contends that Petitioner's ineffective assistance of trial counsel claims are barred by procedural default. It is well-settled, however, that federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The United States Supreme Court has explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the procedural issues are intertwined with the merits of Petitioner's issues and the substantive issues are simpler to resolve. Accordingly, the Court shall proceed to the merits of Petitioner's claims.

14

**B.      Merits**

**1.      State Trial Court's Abuse of Discretion**

As an initial matter, the Court notes that Petitioner is not entitled to relief on any claim that the state trial court abused its discretion in denying his motion for relief from judgment.  Such a claim is not cognizable on habeas review because it is a state law claim.  "A trial court's abuse of discretion generally is not a basis for habeas corpus relief." *Adams v. Burt*, 471 F. Supp. 2d 835, 843 (E.D. Mich. 2007) (citing *Sinistaj v. Burt*, 66 F.3d 804, 808 (6th Cir. 1995)).  Federal habeas courts have no authority to correct perceived errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-58 (1991); *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Habeas relief is not warranted on any such state law claim.

**2.      Effectiveness of Trial and Appellate Counsel**

Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to produce witnesses or seek an adjournment in order to locate them, and for failing to produce a videotape to impeach a victim's testimony and provide a basis for believing the victim was 18 years old; and based upon trial counsel's cumulative errors. Petitioner relatedly asserts that appellate counsel was ineffective for failing to raise these ineffective assistance of trial counsel issues on direct appeal and provide him with a copy of the appellate brief.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel.  First, a petitioner must prove that counsel's

15

performance was deficient.  This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.  Second, the petitioner must establish that counsel's deficient performance prejudiced the defense.  Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.  The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.  *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

The Supreme Court has recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.  "The standards created by *Strickland* and § 2254(d)

16

are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788.

Petitioner raised these issues on collateral review in the state courts and was denied relief. The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof.[1]

Petitioner first asserts that trial counsel was ineffective for failing to present witnesses, including a man named David Wilson from Ohio, Magdelena Sanchez, and social services workers, and/or for not seeking an adjournment to locate them. Well-established federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence." *Towns*, 395 F.3d 251 at 258. "A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Id.* (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)); *see also Wiggins*, 539 U.S. at 526

---

[1]The Court notes that it would reach the same result under a *de novo* standard of review.

17

That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy.  When making such strategic decisions, counsel's conduct must be reasonable.  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23.  The failure to present evidence or call witnesses constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense.  *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Petitioner has not shown that trial counsel erred or that he was prejudiced by counsel's conduct.  First, the record reveals that counsel was aware of these potential witnesses and made reasonable efforts to locate them.  At the evidentiary hearing, John Landis testified that Petitioner named David Wilson as a witness who would testify that the photographs were take in Ohio.  He spoke with Detective Meyer and asked the prosecutor to track Wilson down as a res gestae witness, but no one was able to locate him.  Asad Farah recalled Petitioner mentioning such a witness, but he did not have a location and Farah did not know where to find him.  Landis and Farah both testified about their attempts to locate the state employees.  Farah said that the employees had been fired and he could not obtain their home addresses.  As to Magdelena Sanchez, Farah testified that she was hard to locate, that he unsuccessfully attempted to serve her with a subpoena, and that he did not want to call her as a witness in any event because of her age and relationship with Petitioner.

Second, Petitioner has not provided affidavits from any of the witnesses who he believes that counsel should have called at trial.  His conclusory allegations about what those witnesses would have said are insufficient to demonstrate that counsel erred or that

18

he was prejudiced by counsel's conduct.  *See, e.g., Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007) (conclusory allegations are insufficient to justify habeas relief); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide a basis for evidentiary hearing on habeas review).

Third, trial counsel reasonably believed that the witnesses would not have benefitted Petitioner's defense.  For example, Farah testified that he did not want to call Magdelena Sanchez as a witness because she was young when Petitioner began their relationship such that the jury could have inferred that Petitioner had a pattern of dating young girls, which would have been detrimental to the defense.  As to the social service employees, any testimony that they did not see the girls at Petitioner's home would not have been exculpatory as to the charged offenses and any testimony (contradictory to the former) that they believed MR was 17 years old or older would not have benefitted the defense because the charged sexual conduct offenses are strict liability crimes.  Even David Wilson's claimed testimony that the photographs were taken and developed in Ohio would not have exonerated Petitioner of the criminal sexual conduct charges, and Petitioner would still have been subject to a child sexually abusive activity possession charge.  Trial counsel's conduct did not deprive Petitioner of a substantial defense.

Given the foregoing circumstances, as well as the lack of location information and the prior delays in bringing the case to trial, counsel's decision not to request an adjournment to locate and/or secure the witnesses was also reasonable.  Petitioner has not shown that trial counsel was ineffective under the *Strickland* standard.

19

Petitioner also asserts that trial counsel was ineffective for failing to produce a videotape of the girls having sex with other men.  Again, Petitioner fails to establish that counsel erred.  The record reveals that trial counsel made reasonable efforts to locate the videotape by conferring with prior counsel, by going to Petitioner's apartment, and by speaking to the authorities about his belongings.  The videotape was simply never found.  Petitioner has not shown what more counsel could have done to successfully locate the videotape.  Petitioner also fails to establish that he was prejudiced by counsel's conduct.  First, he has not produced the videotape to support his allegations as to its content and relevancy.  Second, any videotape of the girls having sex with other men would not have absolved him of the charged offenses, including the criminal sexual conduct offenses which are strict liability crimes.  Petitioner has not shown that trial counsel was ineffective.

In sum, while Petitioner alleges that trial counsel failed to provide adequate representation in several respects, such allegations are not supported by the record.  Petitioner has not alleged facts to show what more trial counsel could have done which would have benefitted his defense or affected the outcome at trial.   Counsel challenged the prosecution's case by cross-examining the girls about their version of events, by getting MR to admit that she lied to Petitioner about her age, that she used him, and that she was sexually active with other men, by claiming that the prosecution failed to prove that Petitioner had sex with the underage MR, and by making arguments with the hope of jury nullification.  Given the photographs, the girls' testimony, Petitioner's admissions to the police, and the strict liability of the criminal sexual conduct offenses, counsel's strategy was reasonable.  Petitioner did not have a good defense to the charges.  The fact that trial counsel's strategy was ultimately unsuccessful does not mean that counsel was

ineffective.  *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (an ineffective assistance of counsel claim "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").  Petitioner has not shown that counsel was ineffective under the *Strickland* standard.  More importantly, for purposes of federal habeas review, this Court cannot conclude that the state court's ruling to that effect is unreasonable.

Petitioner also asserts that he is entitled to relief based upon the cumulative effect of trial counsel's alleged errors.  Petitioner, however, has failed to establish that trial counsel erred in the first instance.  Consequently, he cannot establish that he is entitled to relief based upon cumulative error.  *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).  Moreover, "the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *see also Parks v. Bobby*, _ F. App'x _, 2013 WL 6038224, *5 n. 2 (6th Cir. Nov. 15, 2013) (citing *Lorraine* and denying relief on trial counsel cumulative error claim); *Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) (ruling that trial counsel cumulative error claim was not cognizable and citing *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).  Habeas relief is not warranted on this basis.

Lastly, Petitioner asserts that appellate counsel was ineffective for failing to raise the foregoing ineffective assistance of trial counsel issues on direct appeal and for failing to provide him with a copy of the appellate brief.  Given this Court's determination that the ineffective assistance of trial counsel claims lack merit and do not warrant relief, Petitioner cannot establish that appellate counsel was deficient and/or that he was prejudiced by

21

appellate counsel's conduct.  Appellate counsel cannot be deemed ineffective for failing to raise non-meritorious issues.  *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010). Petitioner has not shown that appellate counsel was ineffective under the *Strickland* standard.  Habeas relief is not warranted.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims and the petition must be denied.

Before Petitioner may appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits.  *Id.* at 336-37.  Having conducted the requisite review, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right as to his claims.  A certificate of appealability is not warranted.

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and

**DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  February 27, 2014


I hereby certify that a copy of the foregoing document was served upon counsel of record on February 27, 2014, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager